UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

| | |
|---|---|
| THE UNIVERSITY OF FLORIDA RESEARCH FOUNDATION, INC., ) ) ) ) | |
| Plaintiff, ) ) ) | |
| v. ) ) | Civil Action No. 1:17-cv-00171-MW-GRJ_____ |
| GENERAL ELECTRIC COMPANY, GE MEDICAL SYSTEMS INFORMATION TECHNOLOGIES, INC., and GE MEDICAL SYSTEMS, INC., ) ) ) ) ) ) | |
| Defendants. ) ) | |

## DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS FOR <u>UNPATENTABILITY UNDER 35 U.S.C. § 101</u>

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................1

II.  BACKGROUND ....................................................................................3

    A.   The '251 Patent Teaches Abstract Methods and Systems for Collecting, Manipulating and Displaying Data.....................................3

    B.   The Claimed Invention Is Abstract .......................................................8

III. LEGAL STANDARDS ...........................................................................9

IV.  ARGUMENT.........................................................................................10

    A.   The '251 Patent Claims Are Ineligible Under 35 U.S.C. § 101..........10

        1.   The '251 Patent Claims Fail *Alice* Step One Because The Claims Are Directed To An Abstract Concept ........................10

        2.   The '251 Patent Claims Fail *Alice* Step Two...........................19

    B.   Plaintiff's Conclusory Complaint Allegations And "Expert" Declarations Do Not Save The Claims ...............................................26

V.   CONCLUSION......................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Tex., LLC v. Amazon.com,*
    838 F.3d 1266 (Fed. Cir. 2016) ...........................................................16

*Affinity Labs of Tex., LLC v. DirecTV, LLC,*
    838 F.3d 1253 (Fed. Cir. 2016) ......................................16, 20, 21, 23

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
    573 U.S. ---, 134 S. Ct. 2347 (2014)........................................*passim*

*Alvarez v. ICE,*
    818 F.3d 1194 (11th Cir. 2016) .............................................................9

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,*
    841 F.3d 1288 (Fed. Cir. 2016) ...........................................................17

*Appistry, Inc. v. Amazon.com, Inc.,*
    195 F. Supp. 3d 1176 (W.D. Wa. 2016), *aff'd* 676 F. App'x 1008
    (Fed. Cir. Feb. 10, 2017).............................................................27, 28

*Apple, Inc. v. Ameranth, Inc.,*
    842 F.3d 1229 (Fed. Cir. 2016) ...........................................................21

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).......................................................................10, 27

*Bancorp Servs., LLC v. Sun Life Assur. Co. of Can. (U.S.),*
    687 F.3d 1266 (Fed. Cir. 2012) ...........................................................22

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC,*
    827 F.3d 1341 (Fed. Cir. 2016) ...........................................................26

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).............................................................................10

*Bilski v. Kappos,*
    561 U.S. 593 (2010).............................................................................20

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
   776 F.3d 1343 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 119 (2015) 9, 11, 12, 14

*CyberSource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011) .........................................................13

*DDR Holdings, LLC v. Hotels.com, L.P.*,
   773 F.3d 1245 (Fed. Cir. 2014) .........................................................26

*Digital Media Tech., Inc. v. Amazon.com, Inc.*,
   No. 4:16cv244-MW/CAS, Dkt. 72 (N.D. Fla. July 3, 2017).................................9

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
   758 F.3d 1344 (Fed. Cir. 2014) .....................................................13, 18

*Elec. Power Grp., LLC v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016) ..................................................*passim*

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016) .........................................................17

*Gottschalk v. Benson*,
   409 U.S. 63 (1972)...............................................................15, 24, 25

*I/P Engine, Inc. v. AOL Inc.*,
   576 F. App'x 982 (Fed. Cir. 2014) .....................................................28

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
   792 F.3d 1363 (Fed. Cir. 2015) ....................................11, 12, 16, 23

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   850 F.3d 1332 (Fed. Cir. 2017) ..................................................*passim*

*Intellectual Ventures I LLC v. Symantec Corp.*,
   838 F.3d 1307 (Fed. Cir. 2016) .........................................................30

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
   No. 13-1632, 2017 WL 3706495 (D. Del. Aug. 23, 2017) .................................13

*Internet Patents Corp. v. Active Network, Inc.*,
   790 F.3d 1343 (Fed. Cir. 2015) ..........................................................2

*Kroy IP Holdings, LLC v. Safeway, Inc.*,
    107 F. Supp. 3d 677 (E.D. Tex. 2015), *aff'd* 639 F. App'x 637
    (Fed. Cir. Apr. 21, 2016) ...................................................................28

*Mayo Collaborative v. Prometheus Labs*,
    132 S. Ct. 1289 (2012)................................................................1, 20

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) .................................................17, 19

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
    811 F.3d 1314 (Fed. Cir. 2016) ........................................................27

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015) ..........................................................9

*Orostream LLC v. ABS-CBN Int'l*,
    No. 2:15-cv-248, 2015 WL 5836949 (E.D. Tex. Oct. 1, 2015),
    *aff'd* 683 F. App'x 956 (Fed. Cir. Apr. 7, 2017) ...............................29

*Parker v. Flook*,
    437 U.S. 584 (1978)..........................................................................25

*Parus Holdings, Inc. v. Sallie Mae Bank*,
    137 F. Supp. 3d 660 (D. Del. 2015), *aff'd* 677 F. App'x 682 (Fed.
    Cir. Feb. 27, 2017) ...........................................................................13

*Planet Bingo, LLC v. VKGS LLC*,
    576 F. App'x 1005 (Fed. Cir. Aug. 26, 2014) .......................16, 21, 22

*RecogniCorp, LLC v. Nintendo Co.*,
    855 F.3d 1322 (Fed. Cir. 2017) ........................................................14

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016) ........................................................17

*In re TLI Commc'ns LLC Patent Litigation*,
    823 F.3d 607 (Fed. Cir. 2016) ...............................................13, 16, 21

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ...............................................10, 22, 30

*Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*,
    635 F. App'x 914 (Fed. Cir. 2015), *cert. denied*, — U.S. —, 136 S.
    Ct. 2390 (2016) ...................................................................................16

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
    793 F.3d 1306 (Fed. Cir. 2015) ..........................................................17

*Visual Memory LLC v. Nvidia Corp.*,
    No. 2016-2254, 2017 WL 3481288 (Fed. Cir. Aug. 15, 2017) ...................18, 19

*Voter Verified Inc. v. Election Systems & Software LLC*,
    No. 1:16cv267-MW/GRJ, Dkt. 25 (N.D. Fla. March 21, 2017) .........................9

*Voxathon LLC v. Alpine Elecs. of Am., Inc.*,
    No. 2:15-cv-562, 2016 WL 260350 (E.D. Tex. Jan. 21, 2016), *aff'd*
    671 F. App'x 793 (Fed. Cir. Dec. 9, 2016).........................................29

*Williamson v. Citrix Online, LLC*,
    212 F. Supp. 3d 887 (C.D. Cal. 2016) ................................................29

## I.    INTRODUCTION

The claims of U.S. Patent No. 7,062,251 (the "'251  patent") do not pass muster under either step of the two-step test for patent eligibility set forth in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. ---, 134 S. Ct. 2347 (2014).  The '251 patent "computerizes" what medical workers have done for ages – writing down and integrating bedside patient data using pencil and paper.  The claims of the '251 patent are directed to collecting physiologic data from multiple patient monitoring devices, manipulating it, and displaying it. This functionality is achieved using conventional "bedside machines," a "computing device," and a "graphical user interface." ('251 patent, claim 1.)  As drafted, these claims use generic computer components and technology and fail under both steps of the *Alice* test.  As a result, this infringement action must be dismissed.

In applying *Alice*'s two-step test for identifying ineligible patent claims, a court first determines whether the claims are directed to one of the patent-ineligible concepts—laws of nature, natural phenomena, or abstract ideas.  *Alice*, 134 S. Ct. at 2355 (citing *Mayo Collaborative v. Prometheus Labs*, 132 S. Ct. 1289, 1296–97 (2012)).  If the claims involve a patent-ineligible concept, a court next considers the elements of the claims, both individually and as an ordered combination, to determine whether those elements transform the concept into something that is a patent-eligible application.  *Id.* (citing *Mayo*, 132 S. Ct. at 1297–98).

Examining the claims of the '251 patent at *Alice* step one reveals that their "character as a whole" is directed to an abstract concept. *Internet Patents Corp. v. Active Network, Inc.,* 790 F.3d 1343, 1346 (Fed. Cir. 2015). The steps of asserted claim 1, for example, involve "receiving" physiologic treatment data from bedside machines, "converting" the data to a "machine independent format," performing a "programmatic action" involving the data, and presenting the results on a bedside "graphical user interface." As these highly generalized steps demonstrate, the claims are directed to the patent-ineligible abstract concepts of "collecting, displaying, and manipulating data." *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017).

Further confirming their abstract nature, the claims do not purport to improve the functionality of computers, but instead use generic computer components as tools to carry out an abstract process. The absence of meaningful technical detail in the claims or the specification describing how to achieve the claimed conversion of data from "a machine specific format into a machine independent format" (claim 1) reaffirms that the claims are drawn to the abstract idea itself.

And, as for *Alice* step two, the elements of the asserted claims, viewed individually and as an ordered combination, provide no inventive concept. Instead, they recite generic components such as conventional "bedside machines," a

"computing device," and a "graphical user interface."  The claims do not disclose any unique arrangement of these conventional components or any details regarding their operation.  Instead, these components simply perform their basic functions and provide a generic computing environment in which the abstract concept is carried out.  Thus, because the claims of the '251 patent fail both steps of the *Alice* test, they are invalid.

Defendants General Electric Company, GE Medical Systems Information Technologies, Inc., and GE Medical Systems, Inc. ("GE" or "Defendants") therefore respectfully request that this action be dismissed.

## II.   BACKGROUND

### A.   The '251 Patent Teaches Abstract Methods and Systems for Collecting, Manipulating and Displaying Data

The '251 patent relates to integrating data from different manufacturers' patient monitoring machines and presenting this data in a graphical user interface. ('251 patent, abstract.)  Thus, the idea at the heart of the '251 patent is the age-old concept of integrating information.  (*Id*., providing "[a] method of integrating physiologic data…")

The inventors acknowledge that prior art methodologies for integrating bedside patient information have long existed.  They note that these include "pen and paper methodologies" used by medical staff to record physiologic data from bedside machines onto paper documents such as "flowsheets and patient charts."

('251 patent, 1:21-23.)   Medical staff continued to use these pen and paper methodologies because, according to the '251 patent, monitoring machines "follow[ed] no open standards" and "transmit[ted] data in a proprietary manner using different data formats and protocols," leading to "data integration difficulties."   (*Id.*, 2:17-31.)   Purported drawbacks of these pen and paper methodologies included that they were "very time-consuming and expensive," resulted in "transcription errors," and limited the access to or usefulness of the recorded data for clinical research purposes.  (*Id.*, 1:37-2:16.)

The inventors also acknowledge prior art non-pen and paper systems for integrating bedside patient information.  These systems could "centrally present physiologic data gathered from multiple sources."   ('251 patent, 2:37-38.) However, according to the '251 patent, these systems could only communicate with other bedside machines using the same proprietary protocol, thus restricting the ability to integrate other physiologic data from external sources.  (*Id.*, 2:38-46.) Other prior art systems also acquired data from bedside machines, but according to the '251 patent, they used a proprietary physical connection and did not address "workflow issues."   (*Id.*, 2:58-61.)   Prior art "presentation mechanisms for physiologic data" also existed, but the '251 patent asserts that they could not be configured to present the data in a way that "optimize[d]" physician

comprehension.  (*Id*., 2:62-64.)  Also supposedly lacking were "mechanisms to facilitate data extraction to be used for clinical research."  (*Id*., 2:65-67.)

The '251 patent's proposed solution is "[a] method of integrating physiologic data including receiving physiologic treatment data from at least two bedside machines and converting the physiologic treatment data into a machine independent format."  ('251 patent, abstract.)  Figure 2 of the '251 patent depicts an integration system 200 in accordance with the claimed invention.  (*Id*., 6:62-7:1, Fig. 2.)  Among other things, it includes a bedside device 205, a centralized data repository ("CDR") 230, and bedside machines 235.  (*Id*.)



**FIG. 2**

Each bedside machine 235 can be a sensor of physiologic data that "can determine one or more parameters relating to the health of a patient," including, for example, a blood gas monitor, a pulse oximeter and the like.  ('251 patent, 5:51-57,

7:1-4.)   The bedside machines convey data to a bedside device 205 using a proprietary protocol.  (*Id.*, 7:11-13, 2:25-30.)  The bedside device (which can be an ordinary computer) can use a "driver" to "translate the data stream into content that can be relayed across a network" and provide the data to a CDR.  (*Id.*, 7:14-17, 7:28-31, 7:45-56.)  The CDR uses cross-reference tables to convert the data to a "standardized" or machine-independent format and synchronizes the data with data from other bedside machines, as well as other medical systems.  (*Id.*, 8:36-62.)

As an example, the '251 patent describes converting a value from the machine-specific format of a "floating-point variable" (i.e., a number that can contain a fractional point, such as 7.85) to the standardized machine-independent format of an "integer variable." (*Id.*, 8:52-58.)   The standardized data can be stored, copied, conveyed to the bedside device for display via a graphical user interface ("GUI"), or provided to other data sources.  (*Id.*, 8:40-45, 8:66-67, 9:52-64, 11:24-50, Fig. 5.)

Notably, the inventors of the '251 patent concede that the claimed invention is implemented with generic and conventional components.  For instance, the specification acknowledges that "[a]ny kind of computer system or other apparatus adapted for carrying out the methods described herein is suited," including "a general-purpose computer system with a computer program that, when being loaded and executed, controls the computer system such that it carries out the

methods described herein." ('251 patent, 13:26-37.)  It further acknowledges that the "invention can be realized in hardware, software, or a combination of hardware and software." (*Id.*, 13:26-27.)  The software of the claimed invention is likewise generic and functionally described.  As the patent states, "[t]he present invention also can be embedded in a computer program product, which comprises all the features enabling the implementation of the methods described herein, and which when loaded in a computer system is able to carry out these methods." (*Id.*, 13:38-42.)  This generic "computer program" could be "any expression, in any language, code or notation, of a set of instructions intended to cause a system having an information processing capability to perform a particular function either directly or after either or both of the following:  a) a conversion to another language, code or notation; b) reproduction in a different material form." (*Id.*, 13:42-48.)  No programming or any meaningful technical detail is disclosed.

Other claim components discussed in the specification are likewise generic and conventional.  The "bedside machine," for example, can be any of a wide variety of conventional sensors, such as "a blood gas monitor, an infusion pump, a physiological monitor, a pulse oximeter, a flowmeter, a ventilator, an automated patient care bed, a thermocouple probe, and the like." ('251 patent, 5:51-57.)  The "bedside device" can be any ordinary "computing device," such as "a computer" that accesses and organizes patient data, or alternatively "a communication portal"

that reconciles data streams between local equipment and a network.  (*Id.*, 7:14-20.)  The CDR is a generic centralized data repository, and its functionality could be carried out instead by the bedside machine.  (*Id.*, 6:64-7:1, 9:6-8.)  And, the GUI is boundlessly described as any of a "variety of different GUI types and arrangements of data entry, fields, selectors and controls…."  (*Id.*, 13:15-25.)

## B.    The Claimed Invention Is Abstract

Plaintiff specifically cites only one claim of the '251 patent in its complaint: claim 1.  (*See* Dkt. 1, ¶¶97-102.)  GE agrees that this claim is representative.

Claim 1 provides:

> 1.   A  method  of  integrating  physiologic  treatment  data comprising the steps of:
>
>> receiving physiologic treatment data from at least two bedside machines;
>>
>> converting  said  physiologic  treatment  data  from  a  machine specific format into a machine independent format within a computing  device  remotely  located  from  said  bedside machines;
>>
>> performing  at  least  one  programmatic  action  involving  said machine-independent data; and
>>
>> presenting  results  from  said  programmatic  actions  upon  a bedside graphical user interface.

Stripped of excess verbiage, claim 1 involves collecting data from bedside machines, converting the data to a machine independent format, performing a programmatic action involving the data, and displaying the results on a graphical

user interface.  The remaining claims of the '251 patent do not meaningfully add to or limit the scope of claim 1.

Each claim is directed to collecting, manipulating and displaying data using generic computer components.  They therefore invoke an abstract idea without adding any inventive concept.  They recite no details on the manner in which the recited conventional technologies are used, other than according to their ordinary functions, and disclose no additional features sufficient to transform this abstract idea into a patent-eligible application.

## III.   LEGAL STANDARDS

Patent eligibility under § 101 is a question of law suitable for resolution on a motion to dismiss.  *OIP Techs., Inc. v. Amazon.com, Inc.,* 788 F.3d 1359, 1362 (Fed. Cir. 2015); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1345 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 119 (2015) (affirming finding of ineligibility made on 12(b)(6) motion); *Digital Media Tech., Inc. v. Amazon.com, Inc.*, No. 4:16cv244-MW/CAS, Dkt. 72 (N.D. Fla. July 3, 2017) (granting 12(b)(6) motion to dismiss on grounds of patent ineligibility); *Voter Verified Inc. v. Election Systems & Software LLC*, No. 1:16cv267-MW/GRJ, Dkt. 25 (N.D. Fla. March 21, 2017) (same).  In ruling on a motion to dismiss, the court "must accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff."  *Alvarez v. ICE*, 818 F.3d 1194,

1200 (11th Cir. 2016).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions…."  *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## IV.    ARGUMENT

### A.    The '251 Patent Claims Are Ineligible Under 35 U.S.C. § 101

#### 1.    The '251 Patent Claims Fail *Alice* Step One Because The Claims Are Directed To An Abstract Concept

Step one of the *Alice* two-step test requires an examination of claims to determine whether their "focus" or "character as a whole" is directed to excluded subject matter.  *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); *Alice*, 134 S. Ct. at 2355-56.  The goal of this step is to identify the basic concept at the "heart" of the claims.  *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714–15 (Fed. Cir. 2014) (abstract idea at the "heart" of eleven-step claim was using advertising as an exchange or currency).

Here, examining claim 1 of the '251 patent confirms that it is focused on collecting, manipulating and displaying information.  It therefore falls into the "familiar class of claims" that the Federal Circuit has repeatedly held are directed to the patent-ineligible abstract concepts of collecting information, analyzing it, and displaying certain results of the collection and analysis.  *Elec. Power Grp.*, 830 F.3d at 1353.  *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 850

F.3d 1332 (Fed. Cir. 2017), for example, involved an abstract concept very similar to the one here and is illustrative of this pervasive line of authority.  There, the representative claim was to an "apparatus for manipulating XML documents."  *Id*. at 1339.  The claim elements included (1) a processor, (2) a component that organizes data components of one or more XML documents into data objects, (3) a component that identifies a plurality of primary record types for the XML documents, (4) a component that maps the data components of each data object to one of the plurality of primary record types, (5) a component that organizes the instances of the plurality of primary record types into a hierarchy to form a management record type, (6) a component that defines a dynamic document for display of an instances of a management record type through a user interface, and (7) a component that detects modification of the data in the dynamic document via the user interface, and in response thereto modifies a data component in an XML document.  *Id*.

Despite the prolixity of the claim language, the Federal Circuit held that the claims were directed to the abstract idea of "collecting, displaying, and manipulating data."  *Intellectual Ventures I*, 850 F.3d at 1340.  The court analogized the claims to other ineligible claims reciting similar data manipulation steps, such as those in *Content Extraction*, 776 F.3d at 1347, *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1347 (Fed. Cir. 2015), and

*Electric Power Group*, 830 F.3d at 1353–54.  *Id*.  For instance, it noted that the analogous invention in *Content Extraction* involved "extracting data from a document, entering the data into appropriate data fields, and storing data in memory," and thus was directed to the abstract concept of "'1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing recognized data in a memory.'"  *Id*. (quoting *Content Extraction*, 776 F.3d at 1347).  It also highlighted similarities to the ineligible invention in *Capital One Bank*, which involved "customizing information and presenting it to users based on particular characteristics."  *Id.* (citing *Capital One Bank*, 792 F.3d at 1370).  And it pointed to the comparably abstract claims in *Electric Power Group*, which were directed to "collection, manipulation, and display of data."  *Id*. (citing *Elec. Power Grp.*, 830 F.3d at 1353–54.

Particularly relevant here, the Federal Circuit rejected the patentee's argument that the invention was not abstract because it "relates to a specialized computer language – XML – and renders otherwise incompatible documents compatible through a unique dynamic document" based on data structures recited by the claims.  In other words, just like claim 1 of the '251 patent, the patent in *Intellectual Ventures I* involved the manipulation of data to render otherwise incompatible information compatible.  This was not enough to save the claims from abstraction because "the underlying concept embodied by the limitations

merely encompasses the abstract idea itself of organizing, displaying, and manipulating data of particular documents." *Intellectual Ventures I*, 850 F.3d at 1341.

Thus, as in *Intellectual Ventures I* and the litany of analogous Federal Circuit decisions it cites, the claims of the '251 patent are directed to an abstract concept: collecting, manipulating and displaying information. *See also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) (holding claims to classifying and storing digital images in an organized manner to be abstract); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) (finding that "a process of organizing information through mathematical correlations" is an abstract idea); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011) (finding claimed process to "manipulate[ ] data to organize it in a logical way" was not sufficiently transformative to state a patent eligible invention); *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, No. 13-1632, 2017 WL 3706495, *9-10 (D. Del. Aug. 23, 2017) (patent directed to "converting a multimedia message into a common format – an email message – for sending to another party and then converting the received common format back into [a] multimedia message" covered an abstract idea because it addressed the problem of "incompatibility in communication," which "has existed ever since human languages diverged"); *Parus Holdings, Inc. v. Sallie Mae Bank*, 137 F.

Supp. 3d 660, 673 (D. Del. 2015), *aff'd* 677 F. App'x 682 (Fed. Cir. Feb. 27, 2017) (patent that plaintiff characterized as "unifying different types of electronic voice and data communication systems" held to be directed to abstract idea of "organizing human (business) activity."); *see also RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) ("This method reflects standard encoding and decoding, an abstract concept long utilized to transmit information.").

To the extent the '251 patent claims purport to describe an advance, it is on collecting, manipulating and displaying information of a specified content, and not on any particular inventive technology for performing any of those functions. That is the essence of an abstract idea. *Elec. Power Grp.,* 830 F.3d at 1354; *see also* 1355 ("[M]erely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes….").[1]

---

[1] Although the Court need not analyze unasserted claims because they are substantially similar to representative claim 1 and linked to the same abstract idea, *Content Extraction*, 776 F.3d at 1348, those claims also confirm there is nothing concrete. Segmenting data into discrete elements before converting it to a standard format (claims 2 and 3), removing certain information and storing other information (claim 4), and responding to a request from a GUI (claim 5) are not meaningfully distinguishable from processes and systems for data collection and manipulation that the Federal Circuit has repeatedly held to be abstract. *See, e.g.*, *Elec. Power Grp.*, 830 F.3d at 1353–54 (collecting cases). Rearranging, adding or subtracting the conventional devices and systems involved in the collection, manipulation and display of data (claims 6 through 13) does not render the claims

If more were needed, the '251 patent claims' failure to recite the technical details for how to achieve the claimed converting of physiologic treatment data "from a machine specific format into a machine independent format" further confirms that the claims are directed to an abstract concept. The claims do not explain or limit how the computer would be programmed or provide any other meaningful technical detail for accomplishing these functions. The specification

---

eligible either. *See, e.g.*, *Alice*, 134 S. Ct. at 2351 (invalidating claims under § 101 where "the system claims recite a handful of generic computer components configured to implement the same idea" as method claims). For example, rearranging the generic devices of claim 1 by including only one bedside machine, adding that the bedside computing device is linked to the bedside machine and a network, and requiring a CDR linked to the bedside computing device to perform the data conversion step (claim 6) does not save the claim from abstraction. Neither does adding a generic "physiologic information system" (claim 7) or a clinical research information system that can access data from the bedside machines (claim 8). For the same reason, reciting at least two bedside machines using different data conventions and requiring that the CDR be linked to the bedside machines instead of the bedside computing device (claim 9) does not alter the result at *Alice* step one. The same holds true for claim 10, which adds a generic bedside computing device with a "black box" bedside machine driver to facilitate data exchanges, and claim 11, which merely adds that the bedside computing device is configured to perform the generic functionality of communicating data with a laboratory information system, hospital information system, or pharmacy information system. Claims 12 and 13 provide nothing patent eligible either. They add a machine-specific data store linked to the CDR that has at least one table for cross-referencing machine-specific data to standardized data (claim 12) or for cross-referencing database-specific data to standardized data (claim 13). Converting data using tables is abstract and ineligible. *Gottschalk v. Benson*, 409 U.S. 63, 64 (1972). Finally, recasting method claims as "machine-readable storage" claims (claims 14 through 18) does not render them non-abstract. *See, e.g.*, *Alice*, 134 S. Ct. at 2351 ("Because petitioner's system and media claims add nothing of substance to the underlying abstract idea, they too are patent ineligible under § 101.").

does not provide this disclosure, either, and instead simply parrots the functions of the claims in schematics and depictions of various user interface screens. In short, "[t]he specification fails to provide any technical details for the tangible components, [and] instead predominantly describes the system and methods in purely functional terms," a telltale sign that the claims are abstract. *TLI Commc'ns,* 823 F.3d at 612. From this perspective, the claims recite the same type of purely functional language that routinely has been held to reflect an abstract idea. *See, e.g.*, *Affinity Labs of Tex., LLC v. DirecTV, LLC,* 838 F.3d 1253, 1258 (Fed. Cir. 2016) ("There is nothing in claim 1 that is directed to *how* to implement out-of-region broadcasting on a cellular telephone. Rather, the claim is drawn to the idea itself.") (emphasis in original); *Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*, 635 F. App'x 914, 918 (Fed. Cir. 2015), *cert. denied*, –– U.S. ––, 136 S. Ct. 2390 (2016) (patent lacked "any details about how the 'expert system' works…."); *Affinity Labs of Tex., LLC v. Amazon.com*, 838 F.3d 1266, 1269–70 (Fed. Cir. 2016) ("The purely functional nature of the claim confirms that it is directed to an abstract idea….").[2]

---

[2] The fact that the claims could be carried out in the human mind or by pencil and paper further demonstrates that they are abstract. *See, e.g., Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007–08 (Fed. Cir. Aug. 26, 2014) (employing similar analysis to conclude that claims involving "computer-aided" methods and systems for managing the game of bingo were abstract); *Capital One Bank (USA)*, 792 F.3d at 1368 (claims directed to budgeting calculations unpatentable where calculations 'could still be made using a pencil and paper' with a simple

By stark comparison, the asserted claims do not share the specific features directed to improving computer technology that are needed to pass muster under step one. *See, e.g.*, *Enfish, LLC v. Microsoft Corp.,* 822 F.3d 1327, 1339 (Fed. Cir. 2016) (self-referential table for computer database that comprised "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory."); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (finding claims eligible where they recited particularized set of rules for achieving automated lip-synchronization of 3-D characters that were "focused on a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type."); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016) (finding claims eligible where they recited "an unconventional technological solution (enhancing data in a

---

notification device.") (internal citation omitted). Indeed, the '251 patent concedes that the claimed method replaces "pen and paper methodologies [that] have been used for recording physiologic data…." ('251 patent, 2:17-19; see also 1:21-23.) Plaintiff's conclusory and irrelevant argument in the complaint that the claims "collect, manipulate, interpret, and display information in a manner that could not be and was not performed by humans," even if true, does not render the claims non-abstract. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1150 (Fed. Cir. 2016) (holding claims to be ineligible and stating: "[t]hat a human circuit designer may not use the specific method claimed when translating a functional description of a logic circuit into a hardware component description of the logic circuit as Synopsys contends does not change this result."); *see Versata Dev. Grp., Inc. v. SAP Am., Inc*., 793 F.3d 1306, 1335 (Fed. Cir. 2015) ("Courts have examined claims that required the use of a computer and still found that the underlying, patent-ineligible invention could be performed via pen and paper or in a person's mind.").

distributed fashion) to a technological problem (massive record flows which previously required massive databases)."); *Visual Memory LLC v. Nvidia Corp.*, No. 2016-2254, 2017 WL 3481288, *5 (Fed. Cir. Aug. 15, 2017) (finding claims eligible where they recited "a new, improved and more efficient memory system.").

Unlike in *Enfish*, *McRO*, *Amdocs*, and *Visual Memory*, the '251 patent claims do not purport to improve anything about how a computer operates. The claims in this case recite no rules or anything of that kind, do not purport to improve any technological process, and do not require their generic components to operate in an unconventional manner to achieve an improvement in computer functionality. Instead, the claims here merely "organiz[e] [existing] information into a new form," which is the hallmark of an abstract idea. *Digitech*, 758 F.3d at 1351. In fact, the '251 patent admits that it could be implemented with "[a]ny kind of computer system" such as a "general-purpose computer system with a computer program" that carries out the claimed methods ('251 patent at 13:31-35), that the computer program can be "any expression, in any language, code or notation, of a set of instructions" performing the claimed functionality (*id.* at 13:42-48), and that the GUI could be "any of a variety of different GUI types and arrangements of data entry, fields, selections, and controls" (*id.* at 13:18-21). And while it refers to "drivers" and data conversion "tables," (*id.* at 7:48-56, 8:46-62), the '251 patent

does not disclose the programming or other technical details required for those components or to otherwise achieve the functions of the claims, and there is nothing to indicate that the computer activity disclosed by the asserted patents is anything other than routine.

On balance, claims like the ones asserted in this case create unacceptable preemption concerns because they "are not directed to a specific invention and instead improperly monopolize 'the basic tools of scientific and technological work.'" *McRO,* 837 F.3d at 1314 (quoting *Alice*, 134 S. Ct. at 2354). That is why the eligibility analysis looks "to whether the claims in these patents focus on a *specific means or method that improves the relevant technology* or are instead directed to a result or effect that itself is the abstract idea and *merely invoke generic processes and machinery*." *McRO*, 837 F.3d at 1314 (emphasis added). In this case, people have long acquired bedside patient information. In the modern context, the basic tool for integrating such information is a computer. As drafted, the claims of the asserted patents reach too far – they attempt to monopolize "basic tools of scientific and technological work." *Id.* From any perspective, therefore, the asserted claims fail under *Alice* step one.

### 2.    The '251 Patent Claims Fail Alice Step Two

In applying *Alice* step two, a court looks at the elements of each claim "both individually and 'as an ordered combination' to determine whether the additional

elements 'transform the nature of the claim' into a patent-eligible application."
*Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1297–98).  "A claim that
recites an abstract idea must include 'additional features' to ensure 'that the [claim]
is more than a drafting effort designed to monopolize the [abstract idea].' "  *Id.* at
2357 (quoting *Mayo*, 132 S. Ct. at 1297).  "[S]imply appending conventional steps,
specified at a high level of generality, to … abstract ideas cannot make those …
ideas patentable."  *Mayo*, 132 S. Ct. at 1300.  In addition, "the prohibition against
patenting abstract ideas cannot be circumvented by attempting to limit the use of
[the idea] to a particular technological environment."  *Alice*, 134 S. Ct. at 2358
(quoting *Bilski v. Kappos*, 561 U.S. 593, 610–11 (2010)); *see also DirecTV,* 838
F.3d at 1259 ("[M]erely limiting the field of use of the abstract idea to a particular
existing technological environment does not render the claim any less abstract.").

Here, the conventional components of the claims provide no inventive
concept.  The generic "bedside machines" and "computing device" of the claims
behave as expected, performing "well-understood, routine conventional
activit[ies]" to implement the underlying abstract idea.  *Mayo*, 132 S. Ct. at 1298.
The patent admits this, stating that the claims employ a "general-purpose"
computer system with a "computer program" comprising "any expression…of a set
of instructions" to perform the functional steps of the claims ('251 patent, 13:42-
48).  This generic computer implementation simply is not enough to transform a

patent-ineligible abstract idea into a patent-eligible invention.  *See, e.g.*, *Alice*, 134 S. Ct. (finding a "data processing system" to be purely functional and generic); *Planet Bingo*, 576 F. App'x at 1008–09 (finding "a computer with a central processing unit," "a memory," an "input and output terminal," and "a printer" to be merely generic); *DirecTV*, 838 F.3d at 1263 (finding claims invalid that "simply recite[] that the abstract idea of remote delivery will be implemented using the conventional components and functions generic to cellular telephones.")  Because these claim elements "simply provide the environment in which the abstract idea…is carried out," they provide no inventive concept.  *TLI Commc'ns*, 823 F.3d at 614.

"[C]onverting said physiologic treatment data from a machine specific format into a machine independent format" provides no inventive concept either because "[it] merely describe[s] the functions of the abstract idea itself, without particularity."  *Intellectual Ventures I*, 850 F.3d at 1341; *see also Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1242 (Fed. Cir. 2016) (finding claimed software to be non-inventive, noting that "difficulty of the programming details for this functionality is immaterial because these details are not recited in the actual claims."); *Planet Bingo,* 576 F. App'x at 1008–09 ("program…enabling" the steps of managing a game of bingo recited generic computer implementation of abstract idea).  "This is simply not enough under step two."  *Intellectual Ventures I*, 850

F.3d at 1341; *see also Alice*, 134 S. Ct. at 2359 (holding claims to be patent ineligible where "each step does no more than require a generic computer to perform generic computer functions") (internal quotation marks, citation omitted); *Ultramercial*, 772 F.3d at 716 ("Adding routine[,] additional steps … does not transform an otherwise abstract idea into patent-eligible subject matter."); *Bancorp Servs., LLC v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) (appending generic computer components does not "salvage an otherwise patent-ineligible process"). Indeed, the underlying concept embodied by that limitation "merely encompasses the abstract idea itself" of receiving, manipulating and displaying information. *Intellectual Ventures I*, 850 F.3d at 1341.[3]

---

[3] Although the Court need not examine the substantially similar unasserted claims, those claims, too, reinforce that there is no inventive concept here. The "machine-readable storage" claims (claims 14 through 18) include the same elements as representative claim 1 and are non-inventive for the same reasons. Segmenting data into discrete elements before converting it to a standard format (claims 2 and 3), removing certain information and storing other information (claim 4), fail *Alice* step two because "they merely describe the functions of the abstract idea itself, without particularity." *Intellectual Ventures I*, 850 F.3d at 1341. Rearranging, adding and subtracting the conventional devices and systems involved in the collection, manipulation and display of data to include (claims 6 through 13) does not render the claims eligible either. *See, e.g.*, *Alice*, 134 S. Ct. at 2351 (invalidating claims under § 101 where "the system claims recite a handful of generic computer components configured to implement the same idea" as method claims). For example, adding generic computer components and systems such as a CDR (claims 6 and 9), a physiologic information system (claim 7), a clinical research information system (claim 8), a driver to facilitate exchanging data (claim 10), systems with which a generic computing device can communicate (claim 11), and a machine-specific data store with a cross-reference table (claims 12 and 13) provides nothing inventive. None of these elements, viewed individually or

The "programmatic action" to be performed on the machine-independent data is even less specific and fares no better at step two.  A broader or more generically-described function is difficult to envision.

And, the "graphical user interface" of the claims is another generic feature that provides no inventive concept.  *See Intellectual Ventures I*, 850 F.3d at 1342 (holding "user interface" non-inventive as "akin to the generic interfaces we have elsewhere explained impart no inventive concept"); *DirecTV*, 838 F.3d at 1262 ("graphical user interface" was non-inventive "generic feature" of the invention); *Amazon.com*, 838 F.3d at (holding "customized user interface" to be non-inventive); *Capital One Bank (USA)*, 792 F.3d at 1370 (holding that "interactive interface" was not a "specific application of the abstract idea that provides an inventive concept).

Considering the claim elements as an ordered combination does not alter the conclusion at step two.  Just as in *Intellectual Ventures I*, the claims recite generic computer elements – bedside machines and an ordinary computing device – "and a series of generic computer 'components' that merely restate their individual functions."  850 F.3d at 1341.  Thus, "they merely describe the functions of the

---

collectively, "offers a meaningful limitation beyond generally linking the use of the [method] to a particular technological environment, that is, implementation via computers."  *Alice*, 134 S. Ct. at 2360 (internal quotations and citations omitted).

abstract idea itself, without particularity," thereby providing no inventive concept. *Id.* And while the patent purports to have met a need in the art to integrate physiologic data from with bedside machines using different data formats and protocols, "[n]othing in the claims indicate what steps are undertaken to overcome the stated incompatibility problems…." *Intellectual Ventures I*, 850 F.3d at 1342. As in *Intellectual Ventures I*, "the claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it." *Id*. "Our law demands more." *Id*. (citing *Elec. Power Grp*., 830 F.3d at 1356 (cautioning against claims "so result focused, so functional, as to effectively cover any solution to an identified problem")).

The solution claimed by the ordered combination of elements in claim 1 resembles the claimed "programmed conversion of numerical information" that the Supreme Court long ago found to be ineligible in *Gottschalk*, 409 U.S. at 64 (internal quotations omitted), a decision upon which the Supreme Court relied in *Alice*, 134 S. Ct. at 2354–55. In *Gottschalk*, the patent claimed a "method of programming a general-purpose digital computer to convert signals from binary-coded decimal form into pure binary form." 409 U.S. at 65. The claimed method was "a generalized formulation for programs to solve mathematical problems of converting one form of numerical representation to another." *Id*. It converted "BCD numerals to pure binary numerals," a process that could be done mentally

through use of a conversion table.  *Id*. at 66–67.  The Court found that the claimed method was patent ineligible because it was directed to an abstract idea that could be "carried out in existing computers long in use, no new machinery being necessary."  *Id*. at 67.

The same holds true for the very similar method claimed by the '251 patent. It involves converting data "from a machine specific format into a machine independent format" using a generic "computing device" that can apply a "conversion table" to accomplish the claimed conversion.  ('251 patent, claim 1, 8:46-62.)  The conversion table, like the table in *Gottschalk*, simply correlates one set of numbers to another.  (*Id.*, 8:46-62.)  Thus, like the claimed method in *Gottschalk*, the ordered combination of elements in claim 1 of the '251 patent provides nothing inventive to take it out of the abstract.  *See also Parker v. Flook*, 437 U.S. 584 (1978) (method reciting formula for computing an updated alarm limit during catalytic conversion processes "contains no claim of a patentable invention" because "if a claim is directed essentially to a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, the claimed method is nonstatutory.") (internal quotations and citation omitted).

Thus, just as with step one, the claims in this case in no way measure up to those instances where courts have found an inventive concept to be disclosed.  *See, e.g.*, *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir.

2014) (claims that "overr[ode] the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink" held eligible); *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016) (installation of a filtering tool at a specific location, remote from the endusers, with customizable filtering features specific to each end user represented a "technology-based solution" in order to "overcome[] existing problems with other Internet filtering systems.").

Viewed individually and as an ordered combination, the elements of asserted claim 1 provide no inventive concept. The '251 patent claims thus fail *Alice*'s second prong as well.

**B.     Plaintiff's Conclusory Complaint Allegations And "Expert" Declarations Do Not Save The Claims**

Acknowledging that the '251 patent is vulnerable to a § 101 challenge, plaintiff sprinkled its complaint liberally with conclusions about the novelty, benefits, and purported technological improvements of the claimed invention. Plaintiff went so far as to submit two expert declarations with its complaint, one of which attempts to ascribe details to the drivers and conversion tables of the invention that are found nowhere in the patent (Dkt. 1-2, Declaration of Dr. Bryan Bergeron, M.D., FACMI) and the other of which provides an immaterial discussion of a product that purportedly practiced the patent (Dkt. 1-3, Declaration of Michael D. Weiss, M.D.).

The Court need not look beyond the patent in determining whether it is eligible under § 101 nor credit plaintiff's or its experts' conclusory assertions. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions…."); *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1325 (Fed. Cir. 2016) (affirming court's invalidation of patent as ineligible under 101 on basis of patents alone despite expert testimony because patentee's expert's testimony did not raise a genuine issue of material fact concerning patent eligibility). Indeed, another court recently rejected this same tactic employed by another patentee seeking to avoid an ineligibility determination on a motion to dismiss. *See Appistry, Inc. v. Amazon.com, Inc.*, 195 F. Supp. 3d 1176, 1183 (W.D. Wa. 2016), *aff'd* 676 F. App'x 1008 (Fed. Cir. Feb. 10, 2017). There, the patentee submitted with its complaint the declaration of an expert, who opined that the claims of the patents were novel. The court rejected plaintiff's argument that the court must accept the expert's conclusions as true in considering the defendant's § 101 motion to dismiss, finding it to be "nonsense" and citing *Iqbal*. *Id.* Plaintiff's position in this regard was "absurd" because "[r]equiring the Court to accept such facts or legal conclusions (even in the form of an early expert declaration) would permit any plaintiff to circumvent the § 101 inquiry on an early motion to dismiss or

motion for judgment on the pleadings simply by including a few lines attesting to the novelty of the invention." *Id*. at 1183 n. 6.[4]

But even if the Court were to consider plaintiff's experts' declarations, their content is immaterial to the § 101 inquiry.  Neither declaration directly addresses whether collecting data from bedside machines, converting it from a machine specific format into a machine independent format, and then displaying it, is a patent-ineligible abstract idea.  A similarly deficient expert declaration offered in opposition to a § 101 summary judgment motion was found to be immaterial by Federal Circuit Judge William C. Bryson, sitting by designation in *Kroy IP Holdings, LLC v. Safeway, Inc.*, 107 F. Supp. 3d 677, 701 (E.D. Tex. 2015), *aff'd* 639 F. App'x 637 (Fed. Cir. Apr. 21, 2016).  There, the declaration "focus[ed] on asserting that the claimed [] system requires specialized programming, offers certain efficiencies to users, and is not found in the prior art." *Id*.  But this was immaterial to the § 101 inquiry because the declaration did not address whether the idea at the heart of the patent "is an abstract idea that is not entitled to patenting." *Id*.  The declarations here suffer from the same flaws and deserve the same fate.

Several other courts have likewise disregarded expert declarations like Dr. Bergeron's and Dr. Weiss's as conclusory and/or immaterial to the § 101 inquiry.

---

[4] Allowing such a maneuver also serves to defeat the judicial economy that an early ineligibility determination can provide, including "spar[ing] both litigants and courts years of needless litigation." *I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 996 (Fed. Cir. 2014) (Mayer, J., concurring).

In *Orostream LLC v. ABS-CBN Int'l*, No. 2:15-cv-248, 2015 WL 5836949, *4 (E.D. Tex. Oct. 1, 2015), *aff'd* 683 F. App'x 956 (Fed. Cir. Apr. 7, 2017) for example, the court declined to "rewrite the claims" on the basis of a "conclusory" expert declaration offered in opposition to 12(b)(6) motion to dismiss. Dr. Bergeron's declaration is flawed for the same reason, as it seeks to tack on details concerning the "drivers" and "conversion tables" of the '251 patent that are absent from the patent under the guise of what a person of skill in the art would have understood. (*See, e.g.*, Bergeron Decl., ¶¶ 37-46.)

The experts' testimony concerning the novelty of and purported benefits and improvements offered by the patented invention are likewise immaterial to the eligibility inquiry. *See, e.g., Williamson v. Citrix Online, LLC,* 212 F. Supp. 3d 887, 903–04 (C.D. Cal. 2016) (court disregarded expert's opinion that asserted claims improved the function of computers and addressed a problem that arose uniquely in the context of computers and computer networks because opinion was "contradicted by the specification."); *Voxathon LLC v. Alpine Elecs. of Am., Inc.*, No. 2:15-cv-562, 2016 WL 260350, *4 (E.D. Tex. Jan. 21, 2016), *aff'd* 671 F. App'x 793 (Fed. Cir. Dec. 9, 2016) (finding expert testimony concerning material, non-generic limitations that rendered the claims patent eligible to be "inadequate"). Moreover, novelty and non-obviousness involve separate considerations that do not establish patent eligibility under § 101. *See Ultramercial*, 772 F.3d at 716 ("That

some of the eleven steps were not previously employed in this art is not enough—standing alone—to confer patent eligibility upon the claims at issue."); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1311 (Fed. Cir. 2016) (concluding that asserted claims were patent-ineligible under § 101 even though "[t]he jury found that Symantec had not proven by clear and convincing evidence that any asserted claims were invalid under §§ 102 and 103.")).

The '251 patent is ineligible on its face, and the conclusory and immaterial testimony of Dr. Bergeron and Dr. Weiss does not establish otherwise.

## V.    CONCLUSION

As *Alice* and its progeny establish, the '251 patent is invalid.  Defendants therefore respectfully request that the Court grant their motion to dismiss this action with prejudice.

DATED: September 8, 2017.    Respectfully submitted,


 */s/ Trevor A. Thompson*
**KEITH L. BELL, JR.**
Fla. Bar No.: 573809
kbell@clarkpartington.com
**TREVOR A. THOMPSON**
Fla. Bar No.: 0068006
tthompson@clarkpartington.com
Clark Partington
106 East College Avenue, Suite 600
Tallahassee, FL 32301
Phone:    (850) 320-6838
Fax:      (850) 597-7591

**BRIAN D. ROCHE** *admitted pro hac vice*
Illinois Bar No. 6183795
broche@reedsmith.com
REED SMITH LLP
10 South Wacker Drive-Suite 4000
Chicago, IL  606066
Phone: (312) 207-6490

**DAVID T. POLLOCK** *admitted pro hac vice*
California Bar No. 217546
DPollock@ReedSmith.com
REED SMITH LLP
101 Second Street-Suite 1800
San Francisco, CA  94105
Phone: (415) 659-5620

**GERARD M. DONOVAN** *admitted pro hac vice*
DC Bar No. 997156
gdonovan@reedsmith.com
REED SMITH LLP
1301 K Street, N.W., Suite 1000
Washington, DC 20005
Phone: (202) 414-9224

*Attorneys for Defendants*
*General Electric Company, GE Medical Systems*
*Information Technologies, Inc., and GE Medical*
*Systems, Inc.*

## <u>Certificate of Compliance with Local Rule 7.1(F)</u>

I hereby certify that this motion does not exceed the word limit set forth in Local Rule 7.1(F) because the word count of this pleading is 7,294 excluding the case style, signature block, certificate of service and tables.

*/s/ Trevor A. Thompson*
**TREVOR A. THOMPSON**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to the following parties via the electronic filing system of the Northern District of Florida on the date appearing on the Clerk's CM/ECF electronic docket (or on the following day depending on the recipient's CM/ECF settings) to all parties that have requested notice:

John D. Jopling
  jjopling@dellgraham.com
  dgpleadings@gmail.com
David M. Delaney
  ddelaney@dellgraham.com
DELL GRAHAM, P.A.
*Attorneys for Plaintiff*

Although no formal appearance has been entered by out-of-state counsel, a true and correct copy of the foregoing will also be emailed to associated counsel on the 8th day of September 2017:

Andrew M. Howard
  ahoward@shorechan.com
SHORE CHAN DEPUMPO LLP
*Attorneys for Plaintiff*

*/s/ Trevor A. Thompson*
**TREVOR A. THOMPSON**